**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **KARAN GARY,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:08-CV-00228-L** |
| | ) | |
| **THE COMBINED GROUP INSURANCE** | ) | |
| **SERVICES, INC., et al.,** | ) | |
| **Defendants.** | ) | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Karan Gary ("Plaintiff") brings an employment discrimination suit against her former employers, The Combined Group, Anchor Risk Management Services, Inc. and Anchor Risk Management, Inc. ("Defendants") and six other entities. She seeks relief pursuant to Title VII, Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"); the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"); 42 U.S.C. § 1981a; and the Texas Commission on Human Rights Act, Texas Labor Code § 21.208 *et seq.* ("TCHRA"). The District Court referred this case to the United States Magistrate Judge for pretrial management. Defendants' Motion for Summary Judgment ("Motion"), filed October 31, 2008, is before the Court for findings, conclusions, and recommendation.

The Court has considered the entire record, including Defendants' Motion, Brief, Appendix, and Reply and Plaintiff's Brief in Response and Appendix. The Court finds that Plaintiff has not shown that genuine issues of material fact exist with respect to her ADA disparate treatment claim, her race and age discrimination claims, or her retaliation claim. The Court, however, finds that Plaintiff has shown a genuine issue of material fact with respect to her ADA claim for failure to make reasonable accommodations. Accordingly, the Court recommends that the District Court grant

in part and deny in part Defendants' Motion for Summary Judgment.

### Dismissal of Non-Employer Defendants

Plaintiff sues nine Defendants:  (1) The Combined Group Insurance Services, Inc.; (2) The Combined Group; (3) Christian Brothers Risk Management, Inc., f/k/a Anchor Risk Management, Inc.; (4) Christian Brothers Risk Management Services, Inc., f/k/a Anchor Risk Management Services, Inc.; (5) Christian Brothers Claims Management, Inc., f/k/a Anchor Claims Management, Inc.; (6) Christian Brothers Independent Agencies, Inc., f/k/a Combined Independent Agencies, Inc.; (7) Christian Brothers General Agency Inc., f/k/a CIA Managing General Agency, Inc.; (8) Christian Brothers Premium Finance, f/k/a/ Combined Premium Finance, Inc.; and (9) Christian Brothers Integrated Systems, Inc., f/k/a Quantum Integrated Systems, Inc.  (Orig. Pet.)  Defendants contend that the Court should dismiss all named Defendants except Christian Brothers Risk Management Services, Inc. and The Combined Group.  (Defs.' Br. 38.)

Title VII, the ADA, the ADEA, and the TCHRA prohibit employers from engaging in employment discrimination.  The issue at hand is whether all nine entities listed as defendants are considered Plaintiff's employers under these statutes.  "The ADA's definition of 'employer' mirrors the definitions of 'employer' in Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act (ADEA)."  *U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1279-80 (7th Cir. 1995).  Under Title VII, the term employer is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person."  42 U.S.C. § 2000e(b).  Furthermore, the term "employer" may be construed broadly to include superficially distinct entities that are so interrelated as to constitute a single, integrated

enterprise. *Lusk v. FoxMeyer Health Corp.*, 129 F.3d 773, 777 (5th Cir. 1997). "Factors considered in determining whether distinct entities constitute an integrated enterprise are (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983). Specifically, courts focus on which entity made the final decisions regarding employment matters relating to the person claiming discrimination. *Skidmore v. Precision Printing & Packaging Inc.*, 188 F.3d 606, 617 (5th Cir. 1999).

Defendants now contend that Plaintiff was an employee of Christian Brothers Risk Management Services, Inc. and The Combined Group and was not an employee of the other named Defendant entities. (Defs.' Br. 40.) They argue that the other Defendants did not hire, fire, or assign Plaintiff tasks, and had no input into her compensation or yearly review. (Defs.' Br. 40.) However, Plaintiff and Defendants stipulated that Plaintiff was an employee of Anchor Risk Management, Inc., Anchor Risk Management Services, Inc., and The Combined Group. (Pl.'s App. 25.) Today, Anchor Risk Management, Inc. is known as Christian Brothers Risk Management, Inc. and Anchor Risk Management Services, Inc. is known as Christian Brothers Risk Management Services, Inc. (Orig. Pet.) Plaintiff has not dismissed the other Defendants nor presented any evidence to show that she was employed by any Defendants other than Christian Brothers Risk Management, Inc., Christian Brothers Management Services, Inc., and The Combined Group. Moreover, she has failed to provide any evidence showing that Plaintiff's employers and the non-employer Defendants constitute an integrated enterprise. Therefore, this Court recommends that the District Court dismiss all of the Defendants except Christian Brothers Risk Management, Inc., Christian Brothers Risk Management Services, Inc., and The Combined Group.

### Evidentiary Objections

Before this Court addresses the merits of Defendants' motion, it will rule on the Defendants' objections to the Declaration of Karen Washington and to the Declaration of Karan Gray.

### Defendants' Objections to the Declaration of Karen Washington

Plaintiff's counsel, Karen Washington, filed a notice of intent to use documents labeled P01120 through P01160 in accordance with FED. R. CIV. P. 803(6) and 902(11). (Doc. 28.) Plaintiff then submitted a number of these documents to the Court in her Appendix to Plaintiff's Response to Defendants' Motion for Summary Judgment ("Plaintiff's Appendix"). Defendants now move to strike three of these documents, Plaintiff's Appendix 178, 179 and 180. Plaintiff's Appendix 178 is a Declaration by Karen Washington, attaching "excerpts of medical records for Karan Gary that were kept in the ordinary course of business and which I have given notice of my intent to use in this cause." (Pl.'s App. 178.) Plaintiff's Appendix 179 purports to be a medical record of Lawrence S. Weprin, M.D. (P01122, Pl.'s App. 179.) Plaintiff's Appendix 180 purports to be a letter from Lawrence S. Weprin, M.D. to the Texas Rehabilitation Commission. (P01146, Pl.'s App. 180).

Defendants request that the Court exclude the documents at Plaintiff's Appendix 178-180 because they have not been properly authenticated. (Doc. 38.) "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EVID. 901(a). This means that the court does not require conclusive proof of authenticity before allowing the admission of disputed evidence; rather there need only be some evidence which is sufficient to support a finding that the evidence is what it purports to be. *United States v. Jimenez-Lopez*, 873 F.2d 769, 722 (5th Cir. 1999). One way the document may be authenticated is through its own

distinctive characteristics. *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993) (citing *United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990)).

In this case, two of these documents (Plaintiff's Appendix 179-180), which appear to be from Dr. Lawrence Weprin, have distinctive characteristics.  The medical record, for example, has a distinctive internal pattern, and each entry is marked by the initials LW, which presumably stands for Lawrence Weprin.  (Pl.'s App. 179.)  The letter to the Texas Rehabilitation Commission is typed on a distinctive piece of stationary, indicating Dr. Weprin's specialities and office locations.  (Pl.'s App. 180.)  The letterhead, the format, and the content of the medical record and letter sufficiently authenticate the documents.

The Court finds that the documents at Plaintiff's Appendix 179-180 have been sufficiently authenticated for summary judgment purposes.

Additionally, Defendants request that the Court exclude the documents at Plaintiff's Appendix 178-180 because they are hearsay.  " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  FED. R. EVID. 801(c).  Unless covered within an exception, hearsay evidence is inadmissible at trial, FED. R. EVID. 802, and for summary judgment purposes, *see Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995).  FED. R. EVID. 803(6) provides an exception to the hearsay rule for records of regularly conducted activity.  The rule states:

> **Records of Regularly Conducted Activity.**--A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or *by certification that complies with Rule 902(11)*, Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

*Id.* (italics added for emphasis).

FED. R. EVID. 902 (11) provides in pertinent part:

> **Certified Domestic Records of Regularly Conducted Activity.**--The original or a duplicate of a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written declaration of its custodian or other qualified person, in a manner complying with any Act of Congress or rule prescribed by the Supreme Court pursuant to statutory authority, certifying that the record--
>
> **(A)** was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;
>
> **(B)** was kept in the course of the regularly conducted activity; and
>
> **(C)** was made by the regularly conducted activity as a regular practice.

*Id.*

Plaintiff accompanied Plaintiff's Appendix 179-180 with a written declaration by Karen Washington, Plaintiff's counsel. (Pl.'s App. 178.) However, Plaintiff's counsel has not demonstrated her personal knowledge of each fact nor the basis for her personal knowledge. Rather, she makes a conclusory statement that the facts are within her personal knowledge. Further, Defendants cannot cross-examine the purported medical record to determine what tests the doctor performed or how the doctor reached his conclusions. The same is true for the letter. Plaintiff's

6

counsel's conclusory declaration does not cure these deficiencies or make these two documents competent summary judgment evidence for the Court to consider. The medical record and letter, offered to prove the truth of the matters asserted therein, are hearsay.

Defendants' Objection to the Declaration of Karen Washington on the basis of hearsay is sustained. Therefore, Plaintiff's Appendix 179-180 is excluded from consideration at the summary judgment stage.

### Defendants' Objections to the Declaration of Karan Gary

Defendants object to most of the statements made by Plaintiff in Plaintiff's Declaration as conclusory, inappropriate, lacking verification by expert testimony, vague, speculative, lacking foundation, contradictory, irrelevant, hearsay, unauthenticated, creating an inference not supported by any evidence, not based on personal knowledge, and not the best evidence. (Doc. 37.) Conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). Additionally, evidence that is inadmissible at trial may not be used for summary judgment. *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991). Thus, the Court cannot consider irrelevant or hearsay statements, or those that are unauthenticated, not based on personal knowledge, and not the best evidence.

The Court will not consider any part of Plaintiff's declaration that it finds amounts to unsubstantiated assertions, improbable inferences, and unsupported speculation. Furthermore, it will not consider any information that is irrelevant or is hearsay, and will not consider any statements which are unauthenticated, not based on personal knowledge, and not the best evidence.

Specifically Defendants' object to copies of e-mails, notes, and letters that Plaintiff sent

Defendants on the ground of hearsay and lack of authentication. (Pl.'s App. 9-19.) "E-mails (like letters and other documents) must be properly authenticated or shown to be self-authenticating." *Recursion Software Inc. v. Interactive Intelligence*, 425 F. Supp. 2d 756, 772 n.8 (N.D. Tex. 2006). Because Exhibits 1-B (Plaintiff's Appendix 9) and Exhibit 1-F (Plaintiff's Appendix 14) have distinctive e-mail characteristics and because Plaintiff has stated in her affidavit that she wrote and sent these emails, the Court finds that they meet the threshold for authentication for summary judgment purposes.  In addition, Plaintiff swears in her affidavit that the attached exhibits, 1-D (Plaintiff's Appendix 11) , 1-E (Plaintiff's Appendix 12), 1-G (Plaintiff's Appendix 15), 1-H (Plaintiff's Appendix17), 1-I (Plaintiff's Appendix 18), and 1-J (Plaintiff's Appendix 19), are true and correct copies of the letters she sent to Defendants, complaining about her cubicle.  Her sworn affidavit coupled with the distinctive stationary of Anchor Risk Management are sufficient to authenticate the documents for purposes of summary judgment. The Court therefore overrules Defendants' objection and will consider the e-mails, notes, and letters.

Defendants also object to handwritten notations on the copies of these communications.  The Court sustains Defendants objections to the handwritten notes on the e-mails and will not consider them.  Accordingly, Defendants' Objections to the Declaration of Karan Gary are sustained in part and overruled in part.

### Statement of Facts

Plaintiff is a past employee of Defendant Christian Brothers Risk Management Services, Inc. f/k/a Anchor Risk Management Services, Inc. ("Anchor Risk"), an affiliate of The Combined Group. Anchor Risk is the in-house loss control organization of The Combined Group.  (Defs.' Br. 7.)  The staff of Anchor Risk provides safety program reviews of The Combined Group policyholders, as

well as stand-alone safety consultative services on a fee basis to employers.  (Defs.' Br. 7-8.)

Defendants hired Plaintiff, an African American female, on December 19, 2003, when she was forty-seven years old.  (Defs.' App. 92.)  Plaintiff was an "at-will" employee.  (Defs.' App. 91, 109-10.)  As Administrative Assistant to the President of Anchor Risk, Plaintiff provided the following support: receiving information regarding accounts; performing data entry; coordinating seminars; preparing brochures; communicating with agents, policyholders, and consultants; and assisting the President, as needed.  (Defs.' App. 213.)  Initially, Plaintiff was the Administrative Assistant to Bill Propes ("Mr. Propes").  (Defs.' App. 212.)  When the company replaced Mr. Propes as company president, Mr. Propes remained Plaintiff's supervisor.  (Defs.' App. 210.)  However, the company expected Plaintiff to perform administrative functions for the new president, Mr. Lynn Berg ("Mr. Berg"), as well.  (Defs.' Br. 9.)

Plaintiff wears hearing aids.  Mr. Propes does not recall whether he had knowledge when he hired Plaintiff that she wore hearing aids.  (Pl.'s App. 73.)  However, he saw Plaintiff's hearing aids on her desk one day.  (Pl.'s App. 73.)  Plaintiff had removed her behind-the-ear hearing aids because the batteries were low which caused the hearing aids to squeal.  (Pl.'s App. 73.)  While Plaintiff worked for Mr. Propes, she did not complain to Mr. Propes or anyone else that her hearing was a disability or that she had any problems hearing or communicating.  (Defs.' App. 28.)  She did not ask for any accommodations.  (Defs.' App. 28.)

Plaintiff received three performance evaluations from Mr. Propes, two in 2004 and one in 2005.  (Pl.'s App. 145-48.)  She scored 4.444 on the first, placing her in the highest category ("fits the Firm").  (Pl.'s App. 110.)  Her December 15, 2004 evaluation, which rated employees from 4 ("Average") to 7 ("Excellent") gave her an overall rating of 6.  (Pl.'s App. 112.)  This evaluation

described Plaintiff as dependable and valuable.  (Pl.'s App. 146.)  Plaintiff received three pay raises while she was employed by Defendants.  (Defs.' App. 92.)

Mr. Propes initially prepared Plaintiff's third and final performance review, dated July 15, 2005, rating her as a 6.0.  (Pl.'s App.139, 143.)  Mr. Propes's comments included "organized" and "capability has improved."  (Pl.'s App.139, 143.)  Mr. Propes submitted the review to Mr. Berg for his approval.  (Pl.'s App. 57.)  As a result of Mr. Propes's meeting with Mr. Berg, Mr. Propes lowered Plaintiff's rating in the areas of "attitude" and "reaction to supervision/management." (Pl.'s App. 148.)  The final version of the review, signed July 28, 2005, criticized Plaintiff for not following the lines of communication and added that "disagreement with some company/department direction creates some performance distractions."  (Pl.'s App. 148.)

Between 2004 and March, 2005, Plaintiff's employment was without reported incident except that on August 17, 2004, Mr. Propes reprimanded Plaintiff for the aggravated tone of her e-mails.  (Defs.' App. 155.)  He reminded her that "[o]ur demeanor is important to our effectiveness and how others perceive us."  (Defs.' App. 155.)  However, starting in March 2005, when Mr. Berg became President, a number of incidents occurred.

On March 8, 2005, Plaintiff complained that someone other than Mr. Propes had handed her paycheck to her.  (Defs.' App. 201-03.)  Plaintiff also argued about not being able to use sick leave in four-hour increments and complained that the rule was not included in the employee handbook. (Defs.' App. 156.)

On March 9, 2005, without Mr. Berg's approval, Plaintiff took an office laptop computer home because her home computer was broken and she had not been able to finish her work during the workday.  (Defs.' App. 137.)  Also in March 2005, Mr. Berg requested that Plaintiff go to his

office because he needed to speak with her about a number of issues.  (Defs.' App. 157.)  Mr. Berg claims that Plaintiff came to his office reluctantly, and only after several requests.  (Defs.' App. 157.)  Plaintiff claims that she tried to explain that she was hearing impaired and that because he had been behind her and had not gotten her attention, she had not known that he was standing there or that he had requested her to do something.  (Pl.'s App. 4.)   Mr. Berg contends that when Plaintiff finally reported for the meeting, she told him that "she was 100% loyal only to Bill" and argued with every issue that he raised.  (Defs.' App. 157.)  A mediator was required to talk to Mr. Berg, Mr. Propes, and Plaintiff as a group.  (Defs.' App. 29.)  The mediation went well, and no incidents occurred for a few months.  (Defs.' App. 29.)

Plaintiff's personnel file details eight incidents of poor work performance between August 4, 2005 and December 22, 2005.  (Defs.' App. 30-31.)  Plaintiff was making additional complaints.  For example, she argued she was being "singled out" by having an "extra" performance review in July 2005.  (Defs.' App. 31.)  She was told that all her reviews were done at the same time as other employees' reviews.  (Defs.' App. 31.)

Mr. Berg recalls that Plaintiff had been employed by Defendants for a year and a half when she first complained of discomfort from her hearing aids.  (Defs.' App. 197.)  On July 26, 2005, Plaintiff wrote Ron Flora, a member of management, complaining that a typewriter positioned near her was causing her discomfort from her hearing aids.  (Defs.' App. 128.)  Defendants relocated the typewriter that same day.  (Defs.' App. 128.)

All executives have offices, and all other employees work in cubicles in an open area.  (Defs.' App. 31.)   Certain cubicles are designated for different departments, such as claims, underwriting, loss control, and accounting.  (Defs.' App. 197a.)  There are air conditioning vents

above or near all cubicles to heat and cool the large area evenly.  (Defs.' App. 28.)  In July 2005, Defendants moved some employees' offices and cubicles.  Plaintiff claims that her new cubicle was in a heavy-traffic area, directly under a noisy air conditioning vent.  (Pl.'s App. 4, 9.)  As she was shown where her new desk would be, she claims that she experienced loud feedback from her hearing aids when the air conditioning turned on over the desk.  (Pl.'s App. 4.)  She removed her hearing aids.  (Pl.'s App. 4.)

On July 13, 2005, Plaintiff e-mailed the Chief Executive Officer of The Combined Group, Blake Stock.  (Pl.'s App. 4-5, 9.)  Specifically, she requested assignment to a desk that was against a wall so that the wall would buffer sound.  (Pl.'s App. 9.)  She explained that the desk should be outside the path of foot traffic to reduce ambient noise, and should not be under the specific air conditioning vent that was causing trouble with her hearing aids.  (Pl.'s App. 9.)  She identified a vacant desk and cubicle that she had determined would meet her need for accommodation. (Pl.'s App. 9.)  She told Mr. Stock that the noise interfered with her ability to hear.  (Pl.'s App. 9.)  When Defendants learned of Plaintiff's e-mail to Mr. Stock, they reprimanded her for not going through the chain-of-command in making her request.  (Pl.'s App. 5.)

In April 2006, Defendants offered Plaintiff an alternative cubicle.  (Defs.' App. 198.)  She declined their offer of accommodation, stating that the cubicle was too far from Mr. Propes' office. (Pl.'s App. 81, 88.)  On April 26, 2006, Plaintiff told Mr. Berg that she didn't "want to move just anywhere."  (Defs.' App. 146.)  She identified the vacant cubicle she wanted (the former cubicle of another employee named Ann) and asked if she could start moving her things.  (Defs.' App. 146.) On April 27, 2006,  Mr. Berg wrote her an e-mail stating: "The cube that Ann vacated has already been assigned to another employee.  I am in the process of finding another option for your move."

(Pl.'s App. 14.)   Plaintiff inquired to whom it had been assigned and when it was assigned.  (Pl.'s App. 14.)  Mr. Berg responded that the cube was assigned to the underwriting department, and that when he made the request, he was told that it had already been assigned. (Pl.'s App. 14.)  Plaintiff claims that she made numerous requests for accommodation in the form of desk reassignment or an amplified or "CapTel" phone for her desk.  (Pl.'s App. 4-6, 10-19.)

Plaintiff continued her complaints.  She complained that the spray the copy service used to clean the copy machine "bothered" her. (Defs.' App. 235.)  On May 18, 2006, Plaintiff complained to Mr. Propes about the air spray used by her suite mates to clean their computer keyboards.  (Defs.' App. 235.)  Defendants accommodated Plaintiff by requesting that all spraying be done after hours.  (Defs.' App. 141.)  An example of Plaintiff's attitude is revealed in a May 22, 2006 e-mail.  A fellow employee asked Plaintiff for brochures to pass out at a seminar.  Eight e-mails were exchanged before she provided the brochures needed to market the employer's services.  (Defs.' App. 67-68.)  Plaintiff complained twice that the way the brochures were requested "stopped her daily work."  (Defs.' App. 67-68.)

After many exchanges of e-mails and notes on the subject of moving to a different cubicle, on June 21, 2006, Plaintiff  wrote Mr. Berg, stating that she needed accommodation for her hearing impairment and that she was still waiting for him to act on her requests for a desk move and an amplifier/CapTel phone.  (Pl.'s App. 19.)  She told him that his actions were discriminatory and that if he did not act within thirty days, she would be forced to go outside the company for help.  (Pl.'s App. 19.)

In the Spring and Summer of 2006, Anchor Risk Management was making critical decisions on finances.  On July 21, 2006, Mr. Berg, as the decisionmaker, eliminated Plaintiff's job during a

reduction-in-force ("RIF") because her work was redundant of the work of others, and he decided that her irreverent attitude toward supervisors and others made her the most feasible candidate. (Defs.' App. 117.)  Plaintiff's job was eliminated and her duties assumed by other employees. (Defs.' App. 221-23.)  For example, Mr. Propes began doing his own data entry since Plaintiff's position was eliminated and the position of Administrative Assistant no longer existed. (Defs.' App. 223.)  Plaintiff's duties other than data entry were transferred to employees in the Underwriting Department, and eventually to Chayne Bauer, a female Caucasian who is under age forty.  (Pl.'s App. 43-44; Pl.'s Br. 18.)  The positions of three employees were eliminated in the RIF, including the position of a white male under age forty.  (Defs.' App. 116-17.)  No one has been hired to take Plaintiff's position or the positions of the other two persons whose jobs were eliminated.  (Defs.' App. 189.)

Defendants employ at least two other persons who have impairments, both of whom continued to be employed after Plaintiff's job was eliminated.  (Defs.' App. 118.)   One of these employees is legally blind in one eye and the other is hearing impaired.  (Defs.' App. 118.)

Plaintiff filed for unemployment, citing as reason for discharge, "permanent layoff." (Defs.' App. 168.)  The other two employees who were terminated in the RIF listed the same reason for discharge. (Defs.' App. 175-78.) Plaintiff has not requested any accommodation from any employer since she left Defendants' employ.  (Defs.' App. 84.)

## Standard of Review

When the facts, as evidenced in the pleadings, affidavits, and other summary judgment evidence, show that no reasonable trier of fact could find for the nonmoving party as to any material fact, summary judgment is warranted. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). "The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case." *Lynch Props., Inc. v. Potomac Ins. Co. of Ill.,* 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex,* 477 U.S. at 322-25). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *Fields v. City of S. Houston, Tex.*, 922 F.2d 1183, 1187 (5th Cir.1991). The nonmovant is then required to go beyond the pleadings and designate specific facts proving that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The nonmovant may not rest on conclusory allegations or denials in its pleadings that are unsupported by specific facts. FED. R. CIV. P. 56(e). The court must review all evidence in the record, giving credence to evidence favoring the nonmovant as well as "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses," and disregarding evidence favorable to the movant that the jury would not be required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151 (2000). Further, "the court must draw all justifiable inferences in favor of the nonmovant." *Keelan v. Majesco Software, Inc.,* 407 F.3d 332, 338 (5th Cir. 2005) (citing *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993)).

In determining whether genuine issues of material fact exist, "[f]actual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists." *Lynch,* 140 F.3d at 625.  "If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir. 1991).  In the absence of proof, a court will not conclude that the nonmoving party could prove the required facts.  *Lynch*, 140 F.3d at 625.  Further, the party opposing summary judgment must do more than simply show some "metaphysical doubt as to the material facts."  *Matsushita,* 475 U.S. at 586.

### Plaintiff's ADA Claim for Failure to Make Reasonable Accommodations

Plaintiff alleges that Defendants violated the ADA by discriminating against her on the basis of her disability.  "The ADA is a federal antidiscrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities." *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 161 (5th Cir. 1996) (quoting 29 C.F.R. § 1630, App. (1995)).[1]  Defendants first argue that Plaintiff is not disabled within the meaning of the ADA.  They then argue that even if Plaintiff is disabled under the ADA, they did not discriminate against her based upon her disability.  However, Plaintiff alleges that Defendants violated the ADA by discriminating against her in two ways.  First, she claims that Defendants failed to make reasonable accommodations to her known disability.  *See* 42 U.S.C. § 12112(b)(5)(a).  Second, she claims that Defendants terminated her employment because she is disabled; this amounts to a disparate treatment claim.  *See* 42 U.S.C. §

---

[1] "Congress recently enacted the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008), but these changes do not apply retroactively." *E.E.O.C. v. Agro Distribution, LLC*, 555 F.3d 462, 468 n.8 (5th Cir. 2009).

12112(a).[2]   These two claims represent distinct categories of disability discrimination under the ADA and are analyzed separately under the law.  *See Green v. Nat'l Steel Corp.*, 197 F.3d 894, 897-98 (7th Cir. 1999).

**Plaintiff's Disability**

Defendants argue that Plaintiff is not disabled within the meaning of the ADA.  "The threshold issue in a plaintiff's *prima facie* case is a showing that he suffers from a disability protected by the ADA."  *Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1050 (5th Cir. 1998).  The ADA defines disability as: "**(A)** a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; **(B)** a record of such an impairment; or **(C)** being regarded as having such an impairment."  42 U.S.C. § 12102(1).  Specifically, the ADA "requires an impairment that substantially limits one or more of the major life activities."  *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995).  Therefore, "[a] physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA."  *Id.*  This Court finds that because there is a genuine issue as to whether Plaintiff's impairment is substantially limiting, there is a genuine issue as to whether Plaintiff is "disabled" for the purposes of the ADA.

**Impairment**

Plaintiff alleges that she suffers from a hearing impairment.  The ADA specifically covers physiological disorders and anatomical losses affecting the special sense organs.  *See* 29 C.F.R. § 1630.2(h)(1).  Many courts have recognized hearing loss as an impairment under the ADA.  *See Ivy*

---

[2] Courts analyze claims of disparate treatment brought under the ADA using the same burden-shifting analysis for disparate treatment under Title VII, the ADEA, and the TCHRA.  *See Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995).  Therefore, the Court will consider Plaintiff's disparate treatment claim under the ADA with Plaintiff's Title VII, ADEA, and TCHRA disparate treatment claims.

*v. Jones*, 192 F.3d 514, 516 (5th Cir. 1999).  Moreover, Defendants do not dispute that Plaintiff suffers from a hearing impairment.  (Defs.' Br. 24.)   The Court holds that Plaintiff's hearing loss qualifies as an impairment under the ADA.

### Major Life Activities

Plaintiff argues that her impairment affects the major life activities of hearing and communicating.  Although the ADA does not define the term "major life activities," the Fifth Circuit uses the regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") to "provide significant guidance."  *Dutcher*, 53 F.3d at 726.  The regulations state that "[m]ajor life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  29 C.F.R. § 1630.2(i).  Moreover, "the plain meaning of the word 'major' denotes comparative importance and suggests that the touchstone for determining an activity's inclusion under the statutory rubric is its significance."  *E.E.O.C. v. R.J. Gallagher Co.*, 181 F.3d 645, 654 (5th Cir. 1999) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 638 (1998)) (internal citations omitted).  While there is no authority to support the proposition that communication is a major life activity, there is ample authority to show that hearing is classified as a major life activity.  *See Ivy*, 192 F.3d at 516.  This Court finds that hearing falls within the phrase "major life activities."

### Substantially Limits

Plaintiff argues that even with her hearing aids, her hearing impairment substantially limits her major life activities of hearing and communicating.  While the ADA does not define the term "substantially limits," the Fifth Circuit follows the definitions provided by the EEOC. EEOC regulations provide that "substantially limits" means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  Moreover, the regulations state that the nature and severity of the impairment, its duration or expected duration, and its permanent or expected permanent or long-term impact should be considered when determining whether an impairment substantially limits a major life activity.  29 C.F.R. § 1630.2(j)(2).

Furthermore, when judging whether a person is "substantially limited" in a major life activity and thus "disabled" under the Act, courts must consider corrective and mitigating measures.  *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008).  Therefore, "courts must examine how an impairment affects one's life activities in light of one's attempts to correct his impairment." *Ivy*, 192 F.3d at 516 (quoting *Sutton*, 527 U.S. at 482) (holding that the corrective effects of the Plaintiff's hearing aids should be examined by the court when determining whether Plaintiff was substantially limited).  The court must look at the limitations an individual *actually* faces and whether they are, in fact, substantially limiting.  *Sutton*, 527 U.S. at 488.

Plaintiff claims that even with her hearing aids, she is substantially limited in the major life activities of hearing and communication.  (Pl.'s Br. 10.)  She states that with the hearing aids, she "hear[s] muted sounds, but cannot hear to distinguish words clearly."  (Pl.'s App. 2.)  She states that some sounds cause painful feedback and that background noise makes it significantly harder to hear.  (Pl.'s App. 2.)  She also says that even with the hearing aids, she relies "heavily on lip reading to

understand what someone is saying." (Pl.'s App. 2.) This evidence suggests that Plaintiff's hearing is substantially limited, even with hearing aids.

The evidence that Plaintiff has presented is sufficient to create a genuine issue as to whether Plaintiff is substantially limited by her hearing loss. Therefore, the Court will proceed on the assumption that Plaintiff is disabled and that the ADA does apply in this case.

### Defendants' Failure to Make Reasonable Accommodations

Plaintiff alleges that Defendants did not reasonably accommodate her hearing loss. The ADA prohibits discrimination on the basis of a disability, and expressly defines such discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(a). Therefore, "the ADA provides that employers are liable for failing to make reasonable accommodations to individuals unless the employer demonstrates that the accommodation imposes undue hardship." *Riel v. Elec. Data Sys. Corp*., 99 F.3d 678, 681-82 (5th Cir. 1996). The ADA makes clear that "an employer's obligation to provide a 'reasonable accommodation,' when triggered, contemplates changes to an employer's procedures, facilities, or performance requirements that will permit a qualified individual with a disability to perform the essential functions of his or her job." *Burch v. Coca-Cola Co.*, 119 F.3d 305, 314 (5th Cir. 1997). "To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). As to the third element, "the ADA requires that the employer and

employee engage in an interactive process to determine a reasonable accommodation." *Id.* (quoting *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 2001)). "Courts interpreting the interactive process requirement have held that when an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA." *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999). However, these courts have also held that the employer cannot be found to have violated the ADA when responsibility for the breakdown of the interactive process is traceable to the employee and not the employer. *Id.*

The Court must first determine whether Plaintiff has presented sufficient evidence to show that she is an otherwise qualified individual with a disability and that the employer was aware of this disability. Then the Court must decide whether the Plaintiff has provided enough evidence to create a factual dispute regarding whether Defendants provided Plaintiff with a reasonable accommodation.

## Qualified Individual with A Disability

There is no dispute that Plaintiff is a qualified individual for the purposes of the ADA. Under the ADA, "[t]he term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Because the Defendants do not dispute this element, the Court will assume that Plaintiff is qualified under the meaning of the ADA.

Moreover, as previously discussed, Plaintiff has presented sufficient evidence to create a genuine issue of material fact regarding whether she is disabled under the meaning of the ADA. Therefore, the Court will proceed under the assumption that Plaintiff is disabled under the ADA.

### Defendants' Awareness of Plaintiff's Disability

Plaintiff contends that Defendants were aware of her disability. Evidence in Plaintiff's Brief and Appendix and Defendants' Appendix support this contention. First Plaintiff alleges that "Mr. Propes knew she was hearing impaired, and would, if approaching her from behind, touch her or tap on her desk to get her attention and would make sure that she could see his lips when he spoke." (Pl.'s Br. 12.) Mr. Propes testimony in his deposition supports this allegation: he admits that he learned about Plaintiff's hearing problems because he saw that she wore hearing aids. (Pl.'s App. 73.) Mr. Berg, Plaintiff's boss, states in his deposition that he believed Plaintiff had a hearing disability. (Pl.'s App. 50.) There is also ample evidence that Plaintiff complained about her hearing problems to Defendants. (Defs.' App. 128, 148, 160.) For example, Defendants' Appendix includes an email between two of Defendants' Human Resources employees, Ron Flora and Angela Reed. (Defs.' App. 128.) In this letter, Ron Flora acknowledged that Plaintiff's complaints amounted to "a disability situation" and that HR needed to watch it closely. (Defs.' App. 128.) This evidence is sufficient to show Defendants were aware of Plaintiff's alleged disability.

### Reasonable Accommodations

Defendants claim they did make reasonable accommodations to Plaintiff's known disability. They assert that Plaintiff did not complain about her cubicle until April 2006, and that when she did, they offered her another workstation, which she refused. (Defs.' Br. 11.) Morever, they allege that they made changes in the work environment to accommodate Plaintiff's disability. For example, Plaintiff complained that the spray used to clean the copy machine bothered her. (Defs.' App. 235.) She also complained that the spray used to clean her suite mates' computer keyboards bothered her. (*Id.*) The company then requested that all spray cleaning be done after hours. (Defs.' App. 141.)

Plaintiff, on the other hand, claims that Defendants did not reasonably accommodate her hearing loss.  Plaintiff alleges that in July 2005, Defendants moved her to a new cubicle where the air conditioning unit above the cubicle caused painful feedback in her hearing aids.  (Pl.'s App. 4.) She claims that as a result of this feedback, she had to remove her hearing aids.  (Pl.'s App. 4.) Plaintiff claims she identified this problem to her superiors in July 2005 and asked to be reassigned to a new cubicle.  (Pl.'s App. 4-6, 10-19.)  However, she alleges that it wasn't until April 2006 that Defendants offered her another cubicle.  (Defs.' App. 198, 200.)  Plaintiff also asserts that she requested an amplified or a CapTel phone.  (Pl.'s App. 6.)  There is no evidence that Defendants satisfied this request.

The Court finds that Plaintiff has presented sufficient evidence to show that there is a genuine issue of material fact as to (1) whether Defendants timely engaged in an interactive process with Plaintiff to accommodate her disability and (2) if so, whether Plaintiff or Defendants were responsible in the breakdown of the interactive process.  Therefore a genuine issue of material fact exists regarding whether Defendants made reasonable accommodations to Plaintiff's disability. Therefore, the Court recommends that the District Court deny Defendants' Motion for Summary Judgment on Plaintiff's ADA claim for failure to make reasonable accommodations.

## Plaintiff's Disparate Treatment Claims

Plaintiff alleges that Defendants terminated her employment on the basis of her race in violation of Title VII,[3] on the basis of her age in violation of the ADEA,[4] and on the basis of her disability in violation of the ADA.[5] She also alleges that in terminating her employment, Defendants violated the TCHRA.[6] Defendants contend in their motion for summary judgment that "the clear un-disputed evidence supports a finding Plaintiff was not discriminated against on race or age and she cannot prove her prima facie case on either claim." (Defs.' Br. 14.)

Plaintiff relies on circumstantial evidence to prove Defendants' discrimination. The Court must therefore rely on the analytical framework set forth in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792, 802 (1973) (establishing a burden-shifting analysis used for Title VII disparate treatment claims); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 n.3 (5th Cir. 2000) (applying the *McDonnell Douglas* rubric to ADEA claims)*; Daigle v. Liberty Life Ins. Co.*, 70 F.3d

---

[3] Title VII makes it unlawful for an employer to discriminate against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2.

[4] The ADEA states that "[i]t shall be unlawful for an employer . . . to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1).

[5] The ADA provides: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

[6] The Texas Labor Code states: "[a]n employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer: (1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment . . . ." Tex.Labor.Code § 21.051(1).

394, 396 (5th Cir. 1995) (applying the *McDonnell Douglas* rubric to ADA claims)*; Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999) (applying the *McDonnell Douglas* rubric to TCHRA claims).   Under this test, when a plaintiff attempts to prove her discrimination claims by indirect evidence, as Plaintiff does here, she must first demonstrate a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802.   Second, once a plaintiff demonstrates a prima facie case, the defendant has the burden of production to articulate a legitimate, non-discriminatory reason for its actions. *Id.*   Third, if the defendant meets its burden, the plaintiff must offer sufficient evidence to "create a genuine issue of material fact either (1) that the defendant's reason is not true but is instead a pretext for discrimination...; or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic . . . ." *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (internal quotations and citations omitted).   A reason cannot be a " 'pretext for discrimination' unless it is shown *both* that the reason was false, and that the discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).   "An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998).   To survive summary judgment, the plaintiff must produce evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002).

The elements of a prima facie case of discrimination are as follows: the plaintiff (1) is a member of a protected class, (2) was qualified for her position, (3) suffered an adverse employment

action, and (4) was replaced by someone outside of the protected class, or in the case of disparate treatment, shows that others similarly situated were treated more favorably. *Okoye v. Univ. of Tx. Houston Health Science Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001).

Assuming *arguendo* that Plaintiff has established a prima facie case under Title VII, the ADEA, the ADA, and the TCHRA, the Court must determine whether Defendants have articulated a legitimate, nondiscriminatory reason for terminating Plaintiff's employment. Defendants allege they terminated Plaintiff's employment because they eliminated her position during a RIF, caused by economic conditions. Specifically, Defendants claim they made layoff decisions based upon a redundancy in tasks. (Defs.' App. 190-91.) To satisfy its burden of production, Defendants must clearly set forth evidence which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action about which the plaintiff complains. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

Defendants present the testimony of company employees, Mr. Berg and Mr. Propes, to prove they terminated Plaintiff's employment for legitimate, non-discriminatory reasons. Plaintiff contends that under *Reeves v. Sanderson Plumbing Prods., Inc.* this Court must disregard the testimony of Mr. Berg. 530 U.S. 133, 151 (2000). This Court disagrees with Plaintiff's interpretation of *Reeves*. In *Reeves*, the Supreme Court stated that for the purposes of summary judgment, Courts must only take into account the testimony of disinterested witnesses. *Id.* While Plaintiff asserts that Mr. Berg is an interested witness, she provides no valid reason supporting this conclusion except that he was the decisionmaker. However, the Fifth Circuit has held that "[t]he definition of an interested witness cannot be so broad as to require us to disregard testimony from a company's agents regarding the company's reasons for discharging an employee . . . . [T]o so hold

26

would foreclose the possibility of summary judgment for employers, who almost invariably must rely on testimony of their agents to explain why the disputed action was taken." *Sandstad*, 309 F.3d at 898 (internal citations omitted).  This Court finds that Mr. Berg is not an interested witness for the purposes of summary judgment; therefore it will consider Mr. Berg's affidavit and deposition.

Mr. Berg, Plaintiff's boss, asserts the layoffs were the result of a need to eradicate redundancy in the workplace, consolidate job duties, and make the office run more efficiently. (Defs.' App.  117.)   An employer's decision to eliminate a job position has been repeatedly recognized as a legitimate, non-discriminatory reason for terminating an employee. *E.E.O.C. v. Tex. Instruments, Inc*., 100 F.3d 1173, 1181 (5th Cir. 1996); *Armendariz v. Pinkerton Tobacco Co*., 58 F.3d 144, 150 (5th Cir. 1995). Defendants have produced enough evidence showing that they eliminated Plaintiff's position as a result of company reorganization and job consolidation.  (Defs.' App. 185.)  First, in this RIF, Defendants laid off two other people, one of which was a white male under 40 with no known or presumed disabilities.  (Defs.' App. 117.)  All three employees filed for unemployment, citing "permanent layoff" as the reason for discharge.  (Defs.' App. 168-78.) Second, no one was hired to take Plaintiff's position or the positions of the other two persons whose jobs were eliminated.  (Defs.' App. 186, 189.)  Third, Plaintiff's duties were assumed by other employees.  (Defs.' App. 221-23.)  For example, Mr. Propes began doing his own data entry since Plaintiff's position was eliminated and the position of Administrative Assistant no longer existed. (Defs.' App. 223.)  This evidence is sufficient to show that Defendants have articulated a legitimate, non-discriminatory reason for terminating Plaintiff's employment.

The burden therefore shifts to Plaintiff to raise a genuine issue of material fact concerning whether Defendants' aforementioned reasons are false and a mere pretext for discrimination.

Plaintiff seeks to establish a pretext of discrimination by pointing out that Chayne Bauer ("Ms. Bauer"), the woman who assumed the majority of Plaintiff's duties, is white, young, non-disabled, and had less insurance experience.  (Pl.'s Br. 5.)

While it is not for the Court to decide who was best qualified and whose employment should have been terminated, evidence that Plaintiff was *clearly better qualified* is one way of showing that Defendants' explanation is a mere pretext to discrimination.  *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 814 (5th Cir. 1991).

> The issue is not whether the plaintiff or the retained employees were better qualified.  The employer is entitled to make that decision for itself.  The ADEA was not intended to be a vehicle for judicial second-guessing of business decisions, nor was it intended to transform the courts into personnel managers.  If the factfinder determines that the plaintiff was *clearly better qualified* than the employees who were retained, it is *entitled to conclude that the employer's articulated reasons are pretexts.*  Everyone can make a mistake-but if the mistake is large enough, we may begin to wonder whether it is a mistake at all.

> *Id.* (quoting *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 647 (5th Cir. 1985)) (internal quotations omitted).

Besides stating that she worked for Defendants for two and a half years, Plaintiff offers no evidence showing that she is *clearly better qualified* for the job.  While Plaintiff claims that Ms. Bauer only had experience as a retail clerk and "had no previous experience relevant to the job," upon review of Ms. Bauer's deposition, the Court disagrees with this statement.  (Pl.'s Br. 15.)  Ms. Bauer states that during her employment at Paris Texas Hardware, she assisted the quality control manager, entered information into the database, answered phones, and sent out invoices.  (Pl.'s App. 165.)  Ms. Bauer also states that when she worked at Foley's, she answered the phones, assisted customers, and answered questions regarding billing.  (Pl.'s App. 165.)  Plaintiff has failed to provide any information showing why these tasks are substantially different than the tasks Ms. Bauer

performed while working for the Defendants.[7]  Additionally, Defendants reprimanded Plaintiff on numerous occasions for poor work performance and insubordination.  (Defs.' Br. 10.)  There is no evidence that Defendants reprimanded Ms. Bauer for her work performance or attitude. Accordingly, Plaintiff's arguments regarding Chayne Bauer's qualifications does not raise a material fact issue as to whether Defendants' reason for terminating Plaintiff's employment is false.

This conclusion is bolstered by the fact that Defendants retained employees with impairments.  Defendants employ a female who wears hearing aids. (Defs'. App. 118.)  Plaintiff's supervisor, Lynn Berg, also has an impairment: he is completely blind in one eye.  (Defs'. App. 118.)

Plaintiff also alleges that Defendants' offered severance package could lead a jury to infer discrimination.  However, Defendants offered the same package to the other employees laid off at the same time as Plaintiff.  (Defs.' Resp. Br. 3.)  Therefore, the Court finds that this evidence is not sufficient to create a genuine issue of material fact as to whether Defendants' proffered reasons were a mere pretext to discrimination.

"Where the plaintiff has offered no evidence to rebut the employer's facially benign explanations, no inference of discrimination can be drawn."  *E.E.O.C. v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1447 (5th Cir. 1995).  Because Plaintiff has failed to present any evidence to show that Defendants' non-discriminatory, legitimate reason is false, the Court can draw no inference of discrimination.

Plaintiff can still survive summary judgment by offering sufficient evidence creating a

---

[7] In her deposition, Ms. Bauer states that she performed clerical work such as database entry when first working for Defendants.  She further states that after August 2006, she "took on ERISA," whereby she assisted agents, wrote reports, and answered procedural questions.

material fact as to whether improper motive was one of several motives for an adverse employment action. *See Rachid*, 376 F.3d at 312.  The plaintiff must prove that either age, race, or religion had a determinative influence on the employer's decisionmaking process.  *See West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003).

Plaintiff relies on a comment allegedly made by Mr. Berg to Mr. Propes to prove Defendants' discriminatory intent.  (Pl.'s Br. 18.)  Plaintiff asserts she observed Mr. Berg saying, "Are you sure you want someone like that representing you?"  (Defs.' App. 98-100.)  Plaintiff interpreted his comment as referring to her and referring to her race and age.  (Pl.'s Br. 18.) Plaintiff does not allege  that she complained to personnel, to Mr. Berg's supervisor, the CEO, or to anyone else about Mr. Berg's alleged racial discrimination.

"Stray remarks with no connection to an employment decision cannot create a fact issue regarding discriminatory intent and are insufficient to defeat summary judgment." *Scales v. Slater*, 181 F.3d 703, 712 (5th Cir. 1999).  For comments in the workplace to provide sufficient evidence of discrimination, "they must be 1) related to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." *Auguster v. Vermillion Parish Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001) (internal quotations omitted). Plaintiff has not presented any evidence to show that the alleged remark by Mr. Berg has a demonstrable connection to the RIF.  Plaintiff also has not presented any evidence to show that the alleged remark was proximate in time to her termination.  As such, she has not created a genuine issue of material fact regarding Defendants' discriminatory intent.

Taking the facts most favorably to Plaintiff, and assuming that she made a prima facie case

of discrimination, Defendants have shown  legitimate non-discriminatory reasons for eliminating Plaintiff's job in the RIF.  This Court finds that Plaintiff has failed to introduce sufficient evidence showing Defendants proffered reasons for terminating her employment are mere pretexts for discrimination.  Therefore, this Court recommends that the District Court grant Defendants Motion for Summary Judgment on Plaintiff's Title VII, ADA, ADEA and TCHRA disparate treatment claims.

### Plaintiff's Retaliation Claim

Plaintiff contends that Defendants' termination of her employment was in retaliation for her complaints of discriminatory treatment.  (Pl.'s Br. 14.)  Specifically, Plaintiff asserts that she was fired after having written a letter stating that she would go outside the company for help if the discrimination did not end.  (Pl.'s Br. 4-5.)  An employee has engaged in protected activity when he has "opposed any practice made an unlawful employment practice under [Title VII]," or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  A retaliation claim is weighed under the same burden-shifting framework as one for disparate treatment under Title VII.  *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001).

To establish a prima facie case of retaliation, a plaintiff must show: (1) she engaged in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action.  *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996).  A plaintiff need not prove that the protected activity engaged in was the sole factor for the adverse employment action in order to establish a causal connection between the two.  *Id.* at 305.

For purposes of this summary judgment analysis, the Court will assume the existence of a prima facie case.[8]  However, as noted above, Defendants have provided a legitimate non-retaliatory reason for Plaintiff's termination.  Importantly, since three positions were eliminated, the Court cannot infer that Plaintiff's position was eliminated in retaliation.  Plaintiff has failed to provide any evidence sufficient to show that Defendants' proffered legitimate, non-discriminatory reason is a mere pretext for discrimination.

Plaintiff contends that the Court can infer discrimination because Defendants failed to follow the progressive discipline set out in the company's employee handbook.  However, the discipline policy is irrelevant in this case.  Defendants did not terminate Plaintiff's employment because of her behavior and discipline problems.[9]  Defendants terminated Plaintiff's employment because her position was eliminated during the restructuring of the company.  Moreover, Plaintiff was not the only one whose employment was terminated:  three employees were terminated and their positions eliminated as a result of Defendants' restructuring.  The fact that Plaintiff believed she was more qualified than her replacement and that Defendants should have chosen someone from the underwriting department or a job in that department for elimination is not evidence of retaliation.  Thus, Plaintiff has not raised a fact issue with respect to pretext or retaliation as a motivating factor regarding Defendants' decision to eliminate the position of Administrative Assistant during the RIF.

---

[8] The Court is not convinced that Plaintiff has made a prima facie case.  Plaintiff's position and that of two Caucasians were eliminated.  Plaintiff has not shown a causal connection between the elimination of her position and the supposedly threatening letter that she wrote. However, out of an abundance of caution, the Court will address Plaintiff's arguments on pretext and motivating factor.

[9] Even if Defendants had terminated Plaintiff for performance issues, this would have been a legitimate, non-discriminatory reason for termination.  *See, e.g., Sandstad*, 309 F.3d at 899 (finding legitimate, non-discriminatory reason based on performance issues).

The Court recommends that the District Court grant Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim.

## CONCLUSION

The evidence as a whole, taken most favorably to Plaintiff, would not allow a jury to infer that an actual reason for Defendants' elimination of Plaintiff's position during a RIF was a violation of the ADA, racial discrimination, age discrimination, or retaliation.  However, the evidence, taken most favorably to Plaintiff, shows there is a genuine issue of material fact regarding her reasonable accommodation claim.

## RECOMMENDATION

This Court recommends that the District Court grant Defendants' Motion for Summary Judgment on Plaintiff's Title VII, ADEA, TCHRA, and retaliation claims.  This Court also recommends that the District Court grant Defendants' Motion for Summary Judgment on Plaintiff's ADA claim for disparate treatment.  Additionally, this Court recommends that the District Court deny Defendants' Motion for Summary Judgment on Plaintiff's ADA claim for failure to make reasonable accommodations.  Further, the Court recommends that the District Court dismiss all of the Defendants except Christian Brothers Risk Management, Inc., Christian Brothers Risk Management Services, Inc. and The Combined Group.

**IT IS SO RECOMMENDED**, July 27, 2009.


_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE


33

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must file and serve written objections within ten (10) days after being served with a copy.  A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory, or general objections.  A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).